Good morning. May it please the Court, this is Neil Popovich from Heller-Urman for the petitioner Francis Mondiagba. It's a particular honor for me as well to be here at Botol since I went to school here and teach here from time to time. I would like also, with the Court's permission, to reserve two minutes for rebuttal. In this case, the immigration judge made six separate credibility findings, but they all flowed from one erroneous, unfounded conclusion, which is that Mr. Mondiagba was not who he said he was. But that conclusion has no basis in the record and it is illogical as well. From the moment he was taken into custody upon arrival in the United States, he gave his name as Francis Mondiagba, and his birth certificate, which was filed shortly after his arrival, used the same name. It identified his birth date. It used his parents' names as well. Subsequently, when he provided corroborating evidence in the form of a birth certificate, all of that information was consistent. And so there is no basis for the immigration judge to determine in the first instance that he had doubts as to whether Mr. Mondiagba was who he said he was. Counsel, when he was on the plane, he was instructed by his friends in Nigeria to pretend to be the husband of another woman. Was he carrying any papers that would have identified him with her husband? She was carrying the papers on the plane. And somehow the whole ruse sort of fell apart quickly when they got to San Francisco. Evidently. Was he carrying anything that would have identified him as Francis Mondiagba at the time? A driver's license from Nigeria? Not to my knowledge and not in – there is nothing in the record that would reflect that he was. At what point did he first tell them that he was Francis Mondiagba? I believe that was in his interview when he was taken into custody initially. In the airport in San Francisco. That is correct. But he didn't have – did he have anything else – did he have anything on him that would have identified him as Francis Mondiagba? Not that I'm aware of. Thank you. A few quick words, if I may, about the standard of review. The government and we are generally in agreement on the standard of review that the immigration judge must put forward specific, cogent reasons that have a logical nexus to a credibility determination and that go to the heart of the asylum claim. There's one aspect of the standard of review, though, where we disagree, and that is as to the deference that is due the immigration judge's findings regarding credibility. This is not a case that turns on the demeanor of the witness. There are no comments by the immigration judge about things such as his countenance, how he sat or stood when he was testifying, his tone of voice, his coloration, the types of things that a trial judge, or in this case an immigration judge, would be uniquely situated to observe. This, rather, is a case where the credibility determinations are based on the testimonial and documentary evidence in the record. So this Court, as well as the immigration judge, is fully equipped to assess and, in our view, reassess and reverse the credibility determinations that were made by the immigration judge in this case. Now, the six specific findings, and I fear, given the shortness of time, I may not be able to elaborate on each of them, but I'd like to recite them and then select several that I think are perhaps most important. First of all, the immigration judge did not believe Mr. Amandi Agba would not know about violence that was attributed to the Ijo Youth Movement, of which he was a part. That violence, as the record shows, was alleged. It was not confirmed. Mr. Amandi Agba testified that he did not believe it was true, and he also testified that he was aware of accusations of violence and that those accusations were part of a government effort to discredit the group that he was a part of. Secondly, the immigration judge did not believe Mr. Amandi Agba's testimony about Egbesu. With respect to that subject, there is no inconsistency. Well, going back to the allegations of violence from Amandi, he did give quite contradictory but varying accounts of this during his testimony at various times. To me, this is the only one that really goes to the heart of the claim. How do you explain his difference? At one point he says, for example, that he was not aware of the violence, and the second says, well, that was somewhere else, indicating that he was aware of it. Immigration judge Alyssa's friend, he reads the newspapers and he was said to be a leader in the group. And then he backtracks a little bit on cross-examination as well. How do we deal with that? I think, indeed, that all of that testimony is consistent. It is quite reasonable and logical, and this Court has, in other cases, recognized that there's nothing wrong with an asylum applicant not acknowledging something that he doesn't believe is true. This is analogous to the Singh case in which the failure to mention a false allegation of spousal abuse could not be a basis for finding an adverse credibility finding. In this case, Mr. Amandi Agba testified consistently that he did not know about acts of violence that were, in fact, carried out by members of the Ejo Youth Movement. He also testified consistently that he had heard of them being accused of violence, and he testified consistently that those accusations, which he did not believe and which he once characterized as rumors, were part of a government campaign to discredit him. This is not just his testimony. The expert witness in this case, who was qualified by the immigration judge to testify about the treatment of minorities in the Niger Delta region, corroborated this. Counsel, didn't he also explain that the allegations of violence against the IYM movement were took place in other states, not in Delta State, where he was active? He did, indeed. And along with that, he testified that there were many difficulties in terms of getting accurate information, both reading newspapers that he did not have access to except when he was in graduate school, or rather in school, and also that there was a lack of electricity, so people didn't have televisions to watch. Certainly there was some communication, and he did hear what he characterized as rumors and accusations, and he also testified consistently, and there's no contradictory evidence, that even the alleged incidents did not take place in his area where he was active, which also relates to another misunderstanding that the immigration judge had. He appeared to confuse or conflate Mr. Omondiagba's relatively prominent role in the local Ijo Youth Movement with a relatively, rather extremely minor role, insignificant perhaps, role in the national Ijo Youth Movement. And again, if the Court looks at the record as a whole, it is clear that, although perhaps the nomenclature is not always precise, that the Ijo Youth Movement in some cases refers to the local Sapele branch, where he was, relatively speaking, prominent, and in some cases it refers to the national component, which is really a whole bunch of local organizations in which his role was not prominent. And he – this starts from his declaration, where he first described the Ijo Youth Movement as a local organization based in Sapele. So the fact that he was focused on the local situation is further support for him not necessarily knowing about allegations that go beyond his local area. I see that I am down to my two minutes, so I will reserve if I may. Thank you. We'll hear from the government. Thank you, Your Honor. Andrew Price on behalf of the Attorney General from the U.S. Attorney's Office in Alexandria. The I.J. in this case, Your Honors, quite simply did not believe the testimony that was presented to him by the petitioner. And the immigration judge explained the reasons why he did not believe the petitioner. Those reasons were legitimate, they were reasonable, and they were supported in the record. Why did the manner in which the birth certificate was delivered make any difference at all? How does that go to the heart of the claim? I don't think independently standing on its own it makes too significant of a difference, but it certainly goes to the core of the claim in that it casts doubt on whether Mr. Amangdiaba is who he says he is. Why? I mean, the I.J. said you didn't mail it. It was delivered, hand-delivered, and therefore I think you're a liar. I don't understand that. Looking at it in the context of the overall testimony, the specifically what Your Honor was just talking to Petitioner's counsel about, the inconsistency with Mr. Amangdiaba's purported prominent role in the IYM, yet his lack of knowledge of any of the IYM violence or violence that was attributed to the IYM, his lack of a term at BESU, all of these inconsistencies. Does the government have a theory as to how Mr. Amangdiaba came up with a legitimate birth certificate? No, Your Honor. It was tested forensically, right? It was legitimate. So we have an authentic birth certificate. It was legitimate. So the man who says I'm Francis Amangdiaba has come up with a birth certificate for Francis Amangdiaba. That's correct, Your Honor. And so the government doesn't dispute the authenticity of the birth certificate itself, only the manner of delivery. Yes, Your Honor. And it's an implausible manner in which to obtain the birth certificate. Why is it implausible that somebody would hand-carry a birth certificate if they were coming to the United States? Well, Your Honor. It may be a little unusual. It may be inefficient. It's very unusual, Your Honor. Why would it be unusual in the sense of if it's such a pivotal part of his asylum applications that he wouldn't want a hand-delivered birth certificate? I mean, to me it seemed perfectly logical. That is a perfectly logical explanation, but that's not the explanation that the Petitioner provided to the I.J. The explanation the Petitioner provided to the I.J. was that they did it to reduce costs. And the circumstances surrounding the obtaining of this birth certificate seem inherently plausible. His uncle traveled. His Uncle Pat traveled to Lagos, and he met another woman named Pat who happened to be going to California or the United States, and she hand-delivers it to San Francisco. That type of testimony, along with all of the other testimony in the case, was implausible. But if it's a legitimate birth certificate, what difference does it make? Because there the I.J. does not believe, the I.J. did not believe based on the testimony, based on the three days of hearing testimony, that Mr. Amandiaba says who he says he was. Mr. Rice. Yes, Your Honor. I'd like to get back to the one point that Judge Thomas has already said is somewhat troubling. All the others are just garbage. You might recognize that. We're not going to – those inconsistencies, those alleged things, you don't have to pay any – defend them. They're indefensible. But the one point where you might win, just might, is on the – his denial that he knew about the violence. Now, here is my problem on that. Yes, Your Honor. He denies that any violence – that he knew of any violence. And the I.J. says to him, well, then, you're a national leader, and you don't know about the violence? How can that be? And it seems to me the incredulity of the I.J. goes to his ignorance of the violence. And I'm perfectly prepared to believe that he's lying, that he does know about the violence, but it's so awkward and embarrassing that he denies it. But if I believe that, that he lied about knowing about the violence, it does not go to the heart of his story. It's just peripheral. So tell me why that isn't a fair analysis. Because, Your Honor, the petitioner then was not – assuming your analysis is correct, Your Honor, the petitioner is an untruthful witness. Yes. All our law so far says if you're untruthful and peripheral facts, that doesn't undermine your basic – doesn't go to the heart of the claim. Well, Your Honor, that's first – I would like to establish that that's not – the I.J. did not find that he was lying. He found that he had a lack of knowledge of the violence that was attributed to the I.Y.M. I read the transcript. Yes, Your Honor. And I see what the I.J. saw. This is kind of unbelievable that a national leader doesn't know about it. Yes, Your Honor. And I think that's a point. That's a point there. Well, Your Honor, he did not – the petitioner did not acknowledge knowing anything about the violence. Right. And he's lying. I agree he's lying. That is an acceptable – that's an acceptable view of the case. But as this Court's precedent has made clear, simply drawing two inconsistent conclusions based on the same evidence is not a basis to reverse the I.J.'s decision. What the I.J. found here is that Mr. Ambang-Diaba's failure to know about this violence cast doubt on whether, in fact, he was a prominent member of the I.Y.M. And that is the basis upon which this Court must review his conclusion. How do you deal with the documentary evidence? I mean, we have a newspaper account of the bombing that identifies him by name and says that he was a prominent local member of this group. So if we assume he is who he says he is, isn't that the end of the story in terms of establishing past persecution?  I said assuming. If he is who he says he is, doesn't the documentary evidence establish a claim for past persecution alone? It establishes – it establishes – it probably establishes a claim for past persecution. And that's certainly not the end of the analysis. As we all recall, asylum is a discretionary grant of relief. And the petitioner must still demonstrate to the satisfaction of the attorney general that he has a well-founded fear of future persecution. Right. But you start with the presumption based on past persecution. And in this case, if past persecution is established, we'd have to send it back probably for the government to see whether they can rebut it. But it's – That would be correct, Your Honor. Right. So we don't – we don't get to your issue. But the significance, Your Honor, is that that newspaper article is incontradictory to what the I.J. concluded. And with particular respect to what the I.J. concluded, that the – Mr. Armand Villalba was not a prominent figure in the I.Y.M. Right. But I'm just saying, he's rejecting the petitioner's testimony. Yes. And then making a finding. But even if we rejected the petitioner's testimony, if he is who he says he is – and, again, I know you disagree with this – but if he is who he says he is, the independent corroborating documentary evidence is pretty strong that he suffered past persecution. That is correct. I do agree with that, Your Honor. Counsel, I'm still curious about the identity problem. If the government concedes that the birth certificate is authentic – this is Mr. Armand Villalba's birth certificate. We have an article that says Mr. Armand Villalba's parents' home was bombed. And if we can marry those two things up, it looks like we've got somebody who's entitled to past persecution. That's correct. Okay? Now, how do we – what theory does the government have about how the man who presented himself as Francis Armand Villalba came up with both the article and an authentic birth certificate? We do not have a theory on how he came up with those two documents. Did the government present any evidence or any suggestion that there is a birth certificate fraud going on in Nigeria and the birth certificates are – duplicate copies are easily obtainable? Not that I recall from the record, Your Honor. So we're conceding that somebody has got Armand Villalba's birth certificate. That's correct. And we have no other theory about where Mr. Armand – the real Mr. Armand Villalba  No, we do not. We do not. What we have – And the only reason that we have to think that this guy isn't Armand Villalba is because he seems to deny that the I – that the IYM was engaged in violence and because we don't like the way in which he said he obtained it. And if he – if he'd said – if he'd – if he'd concocted a different story that it was delivered by Federal Express, then the government would have no objections to his identity. That is not – that is not correct, Your Honor. We have the testimony that – regarding the term Egbeisu that goes – that goes to the core of this case because it's – it casts considerable doubt on whether or not he is in fact in Egbe and whether in fact he has any idea what happens at these IYM protests. I have to say, Counsel, that his – that his testimony – I read through these transcripts and I have to say that his testimony was in considerable detail. It is. He offers – he offers times, dates, places. He spells out names of a number of people that presumably the government could have looked into and tried to say, oh, no, Mr. Joseph and Moses were not – are not other leaders of the IYM movement in Nigeria. So he's testified – he's got quite a bit of detail in his testimony. Did the government cast any doubt on any – anything substantive that he said other than the violence? Other than the violence and the term Egbeisu, which is a traditional religion and god of the – Right, but he was a Christian. He wasn't a member of that religion.  Yeah, and he used the word Ogele later on to indicate that it was a – that it was a dance. Yes, he used the word – Your Honor, may I respond? Sure. He did use the word Ogele later on in his deposition, days later in his deposition – or excuse me, his witness testimony. But again, that was directly inconsistent with the facts of this record, that the Egbeisu is not a dance. It is a religion. It's a god. And it's a – Well, Your Honor, that's a perfectly permissible analysis. But the IJ's is equally reasonable. And again, this Court's precedent has demonstrated that the IJ's is not a dance.         It's a god. It's a god. It's a god. It's a god. I agree with Justice Sotomayor that drawing two inconsistent conclusions from the same evidence is the basis to affirm the IJ. Thank you, Your Honor. Any further questions? I don't know. Mr. Brice, I want to say I think you've done a good job in defending a difficult case. And I want just to say one word about why it's a difficult case. Yes, Your Honor. We've had a rash of cases where the IJ has found the applicant for asylum incredible. And I have certainly drawn the conclusion the word has gone out. Find them incredible. You'll insulate your decision from review. And on top of that, there's been a subset of these cases where they say, we don't know who he is. We can't identify him. And that seems to be a particular pattern of some IJs. So you come up here to defend IJs who seem to be operating on a policy of throwing the case out in a way that we can't review it. And that's the difficulty. It's not your fault. You're here. But that's the background. Yes, that's a policy that's far above my pay grade, Your Honor. Thank you very much. Your rebuttal. Thank you. That's hard to top. I won't try. But a few comments in response to Mr. Price's argument. First of all, with respect to the testimony about Igbeisu, it was not days later that Mr. Omondiagwa clarified. In the very next question, his answer to the very next question, after he had erroneously identified it as a dance, he said, all the Ijo youths, they go at demonstration and dance Igbeisu dance. So, again, he's talking about an Igbeisu ritual that is a dance, which he later clarifies is called ogele. And there's documentary evidence in the form of the Human Rights Watch report, which also describes the Igbeisu ritual known as the ogele dance. And the immigration judge relied only on testimony from the expert on a topic where three times she said she was not qualified as an expert regarding Igbeisu. So there really is no contrary evidence. And if the Court looks at the record as a whole, as it certainly is supposed to do, it's clear there's no inconsistency and no basis for a finding lack of credibility on this point. With respect to the procedural status of this case, I would agree with comments from the panel that there is nothing left at issue. If this Court determines that the credibility finding is erroneous, as we believe it is, then all of the evidence in the record shows that a — that past persecution has been established. And certainly, although under the grant of asylum there's room for discretion on withholding of deportation, there is not. This Court can order that withholding of deportation be ordered by the Board of Immigration Appeals or the immigration judge. Thank you. Roberts. Thank you, counsel. The case just heard will be submitted for decision.
judges: Noonan, Thomas, Bybee